WESTON ELECTRICAL INSTRUMENT CO. v. STEVENS et al.

(Circuit Court of Appeals, Second Circuit. November 3, 1904.)

No. 175.

1. PATENTS—REISSUE—ELECTRICAL MEASURING INSTRUMENT.

The Weston reissued patent, No. 11,250 (original No. 433,637) for an electrical measuring instrument used for measuring the difference of potential between the terminals of an alternating current circuit, while disclosing patentable invention in so proportioning the parts of the apparatus as to reduce the effect of self-induction to a negligible quantity, is invalid as a reissue because the description in the original patent fails to show such invention, or that it was intended to be secured thereby.

2. SAME—INVENTION.

The Weston patent, No. 470,340, for an improvement in the electrical measuring instrument described in the patentee's reissue patent, No. 11,250, is void for lack of patentable invention in view of the prior art.

Appeal from the Circuit Court of the United States for the Southern District of New York.

For opinion below, see 119 Fed. 181.

This cause comes here on appeal from a decree of the United States Circuit Court for the Southern District of New York, adjudicating the validity and infringement of claims 2, 4, 6, 10, and 12 of reissued patent No. 11,250, granted June 28, 1892, and of claim 1 of patent No. 470,340, dated March 8, 1892, both granted to Edward Weston, and owned by complainant.

Henry N. Paul, Jr., and Jos. C. Fraley, for appellants.

William H. Kenyon, for appellee.

Before WALLACE, LACOMBE, and TOWNSEND, Circuit Judges.

TOWNSEND, Circuit Judge. As found by the court below, the reissued patent in suit covers the first practically successful commercial alternating current volt meter, and said instrument is recognized as the standard for measuring differences of potential in alternating current circuits. In these circumstances this court has undertaken an examination of the records and briefs with a disposition to give to the owner of said patent the benefit of the presumption thus raised in its favor.

The question of validity of the reissued patent depends upon the determination of the two following contentions of defendants, namely: (1) That Weston did not discover a single principle or solve a single problem in the art of measurement of alternating currents which had not already been so far worked out and published that no invention was required to overcome the alleged difficulties in the way of the practical application of the prior art. (2) That, if invention was required for the practical solution of the alleged problem, it was not disclosed by Weston.

The alleged invention, as stated in the specification—

"Consists, broadly, in a fixed or stationary coil and a coil oscillating or vibrating on inclosed pivots in the field of force of said stationary coil, said

coils being electrically connected. The vibrating coil on the passage of the current through the circuit, including both coils, assumes an angular position, depending upon the difference of potential between the terminals of the circuit. The reversals of the current in both coils occur simultaneously, and hence an index or pointer connected to the movable coil is always deflected in the same direction, thus indicating the extent of said angular movement upon a suitable scale. My invention further consists in the construction and arrangement of the instrument, as hereinafter more particularly pointed out."

And the improved instrument covered by the patent is described by complainant's expert as follows:

"The improvement described in the reissue patent, No. 11,250, relates to an instrument for measuring the difference of potential between the terminals of an alternating current circuit. The instrument is of the type designated as an electro-dynamometer; that is, it is an instrument whose indications depend upon the mutual action between two coils, one fixed and the other movable, both carrying an electric current. The improvement described in the letters patent consists essentially in the mode of supporting the movable coil, the method of applying the springs which counterbalance the action of the electrical forces, and in making use of these springs to convey the electrical current to and from the movable coil. The movable coil is supported on pivots running in jeweled bearings so nicely adjusted that friction is almost entirely absent, the springs which counterbalance the action of the electrical forces are so arranged and connected as not to increase the friction upon the supports, and these springs being employed for conveying the electric current to and from the moving coil, they do away with the necessity of using any auxiliary connections, mercury contacts, or any other means of carrying the current to and from that coil which might introduce friction, and so become a source of error in the instrument. The improvement further consists in so proportioning the coils and various parts of the apparatus that exceedingly delicate springs are sufficient to control the motion of the movable coil, and, therefore, exceedingly small electrical forces are sufficient to produce the movement of the coil necessary to the indications of the instrument, so reducing to a negligible amount the disturbing effect of self-induction when the instrument is used for the measurement of potentials in alternating current circuits."

The claims involved are as follows:

"(2) In an electrical measuring instrument, a stationary coil, a coil pivoted and vibrating in the field of said stationary coil, and a spring opposing and counterbalancing the impressed action of said movable coil, the said coils and spring being in circuit."

"(4) In an electrical measuring instrument, a fixed coil, a movable coil in the field of said fixed coil, an index showing the extent of movement of said movable coil, and a spring opposing and counterbalancing the movement of said movable coil and in circuit therewith, the said elements being constructed and arranged so that said index will be moved directly to show the extent of motion of said movable coil and by the counterbalancing effect of said spring be maintained in such position."

"(6) In an electrical measuring instrument, the combination of a movable conductor actuated by the current to be measured in a field of force maintained by the said current, and a means of indicating the extent of movement of said conductor, the said conductor being constructed to offer such electrical resistance and of such light weight and so freely movable as that the error due to the disturbing effect of self-induction of the actuating current in said conductor shall bear an infinitesimal ratio to the actual indication and be practically nil."

"(10) In an electrical measuring instrument, a stationary coil, a coil vibrating or oscillating in the field of force of said stationary coil, and a spring of conducting material opposing the movement of said vibrating coil, the said coils and spring being electrically connected."

"(12) In an electrical measuring instrument, a stationary coil, a coil vibrating or oscillating in the field of force of said stationary coil, two coiled

springs of conducting material combined with said movable coil, and circuit connections, whereby said springs and movable coil are connected in circuit."

On November 1, 1887, J. Cauderay obtained a patent for an electric dynamometer. This apparatus was intended to measure and register the electric energy of a direct current. It included an electric meter in combination with an electro dynamometer. The latter, which the patentee states "may be used separately," comprised a fixed or stationary coil or bobbin and a movable one. This movable bobbin "consists of a single wooden ring or core, on which is wound a very long, fine wire offering an electrical resistance of about a thousand ohms." It is supplied with a current of electricity through springs of conducting material coiled in opposite directions, "which serve to allow the current to enter and leave without affecting the free movement of the bobbins." An index shows the extent of the movement of said movable coil. This coil or "bobbin is pivoted * * * at the top and at the bottom, resting with its vertical trunnions in two bearings, which are adjustably attached to the frame of the machine. * * * To secure its independence and sensibility, the bobbin is at its center suspended from a silk thread attached to a flexible arm."

Counsel for complainant attempts to meet the disclosures of Cauderay as follows: His patent was a paper patent, and described an instrument which was designed for direct currents only. It could not have been practically used except in a level position, nor adapted to alternating currents without substantial modifications because of said thread suspension, a certain supplemental spring, and of the cumbersome and heavy movable coil. It is not clear that the coiled so-called springs of Cauderay, apparently constructed of copper, performed any opposing and counterbalancing spring functions. And that Cauderay, being a paper patent, did not sufficiently disclose a principle of construction and operation, so that only mechanical skill was required to adapt it to alternating currents, is indicated by the fact that after its issue electrical experts were agreed that no practical means had been devised for measuring alternating currents. If, therefore, the reissue were an original patent, and the patentee were confronted by Cauderay alone, his improvement might be held to be patentable on the theory stated by complainant's expert that it "consists in so proportioning the coils and various parts of the apparatus that exceedingly delicate springs are sufficient to control the motion of the movable coil," etc. But Weston did not confine his inventive ingenuity to electrical measuring apparatus for alternating current instruments. Counsel for complainant, referring to direct current instruments, states that Mr. Weston had been a pioneer in that field also, and had given the art what are to-day the standard and best and best-known portable direct current instruments in the world. These are shown in Weston patents Nos. 392,386 and 392,387. Weston's patent No. 392,387 was granted November 6, 1888, and is therefore prior by some 14 months to the patent in suit. The specification states as follows:

"I design this instrument principally for the measurement of current-pressure or electromotive force in volts. To this end I support the coil upon jeweled pivots, as already explained, so that it will turn with the minimum of friction, and I oppose to its movement the resiliency of a pair of very

delicate springs. In the path of the current before it reaches the coil, I place a high resistance very large in proportion to the internal resistance of the dynamo, or battery, the current-pressure of which is to be measured."

Complainant brought suit in this circuit for infringement of said patent, and on March 2, 1904, Judge Wheeler filed an opinion sustaining its validity. 128 Fed. 939. The following citations from said opinion indicate its bearing on the validity of the patent in suit: Judge Wheeler, after having described the invention, and stated that Weston "did not discover that a coil in a magnetic field would be moved by a current through it against lesser uniform resistance through distance in proportion to the strength of the current," says as follows:

"What he did invent was the arrangement of proper devices in an instrument for producing, measuring, and indicating such a movement of the coil."

And, referring to the prior art, and especially to Weston's prior patent No. 334,143, as the closest approach to the patent there in suit, Judge Wheeler says:

"But in no one of them is there set forth a coil wound upon such a frame mounted on pivots with counter-acting springs carrying the current in such an arc-shaped magnetic field, nor the combination of any of the parts of the patent in suit to as great an extent as that patent. If that patent does not anticipate this invention, it seems clear that none nor all of the others will. That patent shows a field * * * in which a coil of wire wound about diamagnetic metal is suspended in torsional springs, and made to move in the field by an electric current through the coil against the force of the springs, and to indicate the movement by a pointer on a scale. In an instrument of that patent may be found a coil moving in a permanent magnetic field protected in the same way; but the high torsional suspending wires for the coil prevent making the instrument compact, or capable of operation except in a level position; and it was not a practicable electric measuring instrument for use in many places where such instruments are desired, and where that of this patent can be used. * * * The patent in suit seems to be an improvement over the prior patent by mounting the coil on pivots in an arc-shaped magnetic field between the pole-pieces of a horse-shoe magnet and a soft-iron core, instead of suspending the core upon the torsional wires in the magnetic field of the other patent. That this new arrangement of the coil upon pivots in this form of magnetic field, which would be by the arrangement of the bridge pieces permanent, was a great improvement on all or any prior electric measuring instruments, is very plain and obvious from an observation of the things which had gone before. It involved invention of high order, and resulted in great success. Neither the anticipations relied upon nor the alleged want of patentable novelty seem to defeat or affect the validity of the patent for this improvement."

Recurring now to the elements of the reissued patent by which it was differentiated from Cauderay, we find in No. 392,387 an instrument "capable of operation except in a level position," and therefore "a practicable electric measuring instrument" in any and all places, because "an improvement over the prior patent by mounting the coil on pivots * * * with counter-acting springs" and dispensing with the "torsional suspending wires." It does not appear that the pivots and springs perform any function in the reissued patent different from those covered by No. 392,387. It does appear that the objection to the heavy construction of Cauderay was obviated by the coil supported "upon jeweled pivots * * * so that it will turn with the minimum of friction," its movement being opposed by "the resiliency of a pair of very delicate springs." The sole tangible support left for the reis-

sued patent is that it may be claimed to be the first disclosure of the means by which the direct current double coil instrument could be so adapted to the peculiar conditions characteristic of the alternating current as to result in a practical instrument for measuring the differences of potential in an alternating current circuit. The well-recognized obstacle to the use of the direct current instrument for alternating currents was self-induction; the inertia, so to speak, of the movable coil when subjected to constant rapid reversals of current, often of different rates or frequencies of alternation. This drag or reactance is caused by the friction of the movable coil. "The problem," says complainant's expert, "is to so construct the instrument that, while the coil shall produce sufficient magnetic force to insure accurate indications, their self-induction resistance shall be so small in proportion to the total resistance of the instrument that that total resistance will be practically the same when the instrument is used on direct current circuits or upon alternating current circuits of any frequency." Prior instruments had used suspension attachments and mercury cups and other devices to reduce friction to a minimum. Cauderay used both pivots and a suspension device. Weston, in his No. 392,387, supported the "coil upon jeweled pivots * * * so that it will turn with the minimum of friction." He was the first to solve this problem by a transfer of the direct current instrument to alternating currents, and this transfer comprised, as stated by complainant's expert, "proportioning the coils and various parts of the apparatus" and "reducing to a negligible amount the disturbing effect of self-induction."

In view of all the considerations involved and upon a survey of the whole situation, we are of the opinion that this transfer and adaptation involved invention within the familiar rule.

The claim of counsel for complainant on this point is stated as follows:

"I may say right here that Mr. Weston does not claim to have discovered the magnetic effects of coiled conductors carrying an electric current. He does not claim to have discovered the mutual actions of such coils upon each other. He recognizes the fact that these actions were well known, and that instruments had been constructed or proposed making use of such mutual action of the coils for the purpose of measuring electric currents. What Mr. Weston does claim is 'certain features of construction of an instrument for the measurement of electromotive forces or potential differences in alternating current circuits, which special features overcame certain difficulties in the use of the magnetic effects of coils of wire for the measurement of alternating potential differences; difficulties which, up to that time, had rendered the use of such instruments for such a purpose practically valueless.'"

Assuming, therefore, that such transfer and proportioning of parts involved something more than mere excellence of mechanical and electrical construction, we are brought to a consideration of the question whether this feature is disclosed or sufficiently suggested in the original patent. The only distinct claim to this element of the alleged invention is found in the following language of claim 6:

"The said conductor being constructed to offer such electrical resistance and of such light weight and so freely movable as that the error due to the disturbing effect of self-induction of the actuating current in said conductor shall bear an infinitesimal ratio to the actual indication and be practically nil."

The original Weston patent, No. 433,637, describes an instrument for measurement of alternating currents only differentiated from Cauderay in the details shown in Weston patent No. 392,387. It describes the application of the construction shown in No. 392,387 to the moving coil of the electro-dynamometer. The fact that its effective operation is due to the reduction of electrical resistance by a reduction of the number of turns of wire upon the coil is not hinted at in said specification or claims. Nor is it clear that Weston realized the fact that such reduction of resistance should be small in comparison with the total resistance of the instrument, in order to adapt it to alternating currents. While the expert for complainant admits that this is the important consideration in said construction, there is no statement in the original patent differentiating it in this respect from prior direct current instruments.

The expressions in the specification of the original patent chiefly relied on by counsel for complainant to show the conception of the invention covered by the reissue are:

First, that the spools are "surrounded by coils of fine insulated wire," etc. But a winding with fine wire, also described in Cauderay, does not necessarily imply lightness of construction, but, as is shown in Cauderay, applies to the element of high resistance. The important element, self-induction or reactance, says complainant's expert, "depends upon the number of turns and dimensions of the coil." The fewer the number of turns, the smaller is the amount of self-induction. But the use of a fine wire may or may not imply a decreased number of turns. The specification refers to "shellacked paper" in connection with a frame for the movable coil. Hence it is argued "that the inventor had in mind the reduction of the weight of the movable system to a minimum," as, "by making the coils light, the inventor is, of course, enabled to use fewer turns of wire, and the use of a few turns of wire is the very thing that he would do for the sake of reducing the self-induction of the instrument." If Weston had originally such reduction of weight in mind, he skillfully managed to conceal all reference thereto in his original patent. And when he referred, as above, to the material for the frame, he described it not as of light material, but "of insulating material—such as shellacked paper." It is evident that every element except lightening was covered by the prior art, as already shown, and that the effect of so lightening the construction that the effect of self-induction should "be practically nil" is first stated in the reissue.

We have been confirmed in these conclusions by the position which counsel for complainant was forced to assume in his brief and upon the argument of this appeal. He has failed to point out any tangible or definite statement of invention by the patentee, or any novel, concrete creation in the construction of the patented device. In his brief he contradicts the theory of his expert, and states that "the invention is not a matter of electrical proportioning," but that it consists in the combination of parts constituting the concrete instrument. These parts, as defined by him on the argument, were: (1) The closeness of the coil. But it does not appear that that was any closer than Cauderay. (2) Positive pivots, which would hold the point from sidewise movement.

These are described both in Cauderay and Weston's prior patent. (3) Springs. The same as those described in his prior patent. (4) Direct reading. This is shown in Fig. 4 of Cauderay. In these circumstances it is unnecessary to discuss the well-settled rule relative to reissues. It does not appear from the original specification that the patentee had any idea of any novel means for obviating the self-induction resistance of alternating currents. The claims in suit of the reissue cannot be sustained, because the description in the original patent fails to show that the invention covered by said claims was intended to be secured in the original patent. Walker on Patents, § 233, and cases cited; Hoskin v. Fisher, 125 U. S. 217, 223, 8 Sup. Ct. 834, 31 L. Ed. 759; Pattee Plow Company v. Kingman, 129 U. S. 294, 299, 9 Sup. Ct. 259, 32 L. Ed. 700; Featherstone v. Bidwell, 57 Fed. 631, 6 C. C. A. 487. The improvement of patent No. 470,340 consists in omitting the shellac paper frame of the movable coil of the reissued patent in suit and in constructing it in its annular shape by winding the wire around a mandrel and cementing it together by means of an exterior coating of shellac. This construction reduced the weight of the movable coil, which was the stated object of the alleged invention. The specification of Weston's prior patent No. 392,385 describes a rectangular coil "wound upon any suitable form" and permeated with shellac, "whereby all the turns of the wire are firmly fastened together," and which is removed from the form when the shellac is dry. While No. 470,340 specifically covers an annular construction, the specification states, "by changing the shape of the former A, I may make the coil of any desired form." Other prior publications disclose similarly constructed coils, differing only in shape from that of the patent in suit, in being rectangular with rounded corners. These prior constructions were designed for use in direct current instruments. The argument that it required invention to use such a coil "of any desired form" with an alternating current, or to thus change the shape of the coil, cannot be sustained, especially as it does not appear that any different or new function was accomplished by reason of such use or change.

The decree of the Circuit Court is reversed, with costs, and the cause is remanded to the Circuit Court, with instructions to dismiss the bill.